# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CURTIS OFORI,

        Plaintiff,

v.

BETTER PUBLICATIONS, LLC,

        Defendant.

Civil Action No. 12-cv-01958 (BAH)

## DEFENDANT'S SPECIAL MOTION TO DISMISS PURSUANT TO THE D.C. ANTI-SLAPP ACT

Pursuant to the District of Columbia Anti-SLAPP Act of 2010, D.C. Code § 16-5502(a) (the "Anti-SLAPP Act" or the "Act"), Defendant Better Publications, LLC hereby respectfully moves for an order dismissing the Complaint with prejudice. In the event that the motion is granted, Defendant reserves the right to file a motion seeking an award of the costs of litigation hereof, including attorneys' fees, as provided by D.C. Code § 16-5504(a), within fourteen days after the entry of judgment. Fed. R. Civ. P. 54(d)(2); *see also* Local Rule 54.2 (authorizing court to enter an order "directing the parties to confer and to attempt to reach agreement on fee issues").

For the reasons set forth more fully in the accompanying Combined Memorandum of Points and Authorities in Support of Defendant's Special Motion to Dismiss Pursuant to the D.C. Anti-SLAPP Act and Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Declaration of Shaina D. Jones and exhibits attached thereto, Defendant's publication is protected by the Anti-SLAPP Act, as it constitutes an "[a]ct in furtherance of the right of

1

advocacy on issues of public interest," D.C. Code § 16-5502(a), and Plaintiff Curtis Ofori is

unable to discharge the heavy burden the Act imposes on him to demonstrate that he is "likely to

succeed on the merits" of his defamation claims, D.C. Code § 16-5502(b).

WHEREFORE, for the reasons set forth more fully in the accompanying memorandum,

declaration in support thereof and exhibits attached thereto, Defendant respectfully requests that

the Court grant its special motion to dismiss and enter judgment in its favor dismissing the

Complaint with prejudice.

## REQUEST FOR HEARING

Pursuant to Local Rule 7(f) of this Court, Defendant respectfully requests that the Court

hold a hearing on this motion.

Dated: May 2, 2013                              Respectfully submitted,

                                                LEVINE SULLIVAN KOCH & SCHULZ, LLP


                                                By:___/s/ Seth D. Berlin_____
                                                    Seth D. Berlin (Bar No. 433611)
                                                    Shaina D. Jones (Bar No. 1002801)

                                                1899 L Street, NW
                                                Suite 200
                                                Washington, DC  20036-5514
                                                Telephone:  (202) 508-1100
                                                Facsimile:  (202) 861-9888
                                                sberlin@lskslaw.com
                                                sjones@lskslaw.com

                                                *Counsel for Defendant Better Publications, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of May 2013, I served the foregoing

**DEFENDANT'S SPECIAL MOTION TO DISMISS PURSUANT TO THE D.C. ANTI-SLAPP ACT, COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S SPECIAL MOTION TO DISMISS PURSUANT TO THE D.C. ANTI-SLAPP ACT AND MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6), DECLARATION OF SHAINA D. JONES** (and exhibits thereto), and **PROPOSED ORDER** by hand delivery and via the Court's CM/ECF system, upon:

>   Donald M. Temple
>   1101 15th Street, NW
>   Suite 910
>   Washington, DC 20005
>
>   *Counsel for Plaintiff*

>                       /s/ Seth D. Berlin
>                       Seth D. Berlin

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**CURTIS OFORI,**

             **Plaintiff,**

**v.**

**BETTER PUBLICATIONS, LLC,**

             **Defendant.**

**Civil Action No. 12-cv-01958 (BAH)**

**COMBINED MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANT'S SPECIAL MOTION TO DISMISS
PURSUANT TO THE D.C. ANTI-SLAPP ACT AND MOTION TO DISMISS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Seth D. Berlin (Bar No. 433611)
Shaina D. Jones (Bar No. 1002801)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, NW Suite 200
Washington, DC  20036
Telephone: (202) 508-1100
Facsimile: (202) 861-9888
sberlin@lskslaw.com
sjones@lskslaw.com

*Counsel for Defendant Better Publications, LLC*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

ARGUMENT ...................................................................................................................... 21

    I.    THE IMMUNITY AFFORDED BY THE D.C. ANTI-SLAPP STATUTE
          APPLIES TO OFORI'S ACTION ................................................................................ 21

          A.    The Anti-SLAPP Statute Provides Broad Immunity ................................. 21

          B.    Ofori's Complaint Triggers the Anti-SLAPP Immunity ........................... 24

          C.    To Overcome the Statutory Immunity and Avoid Dismissal, Ofori
                Must Demonstrate that He is Likely to Succeed on the Merits of His
                Claims ................................................................................................... 26

    II.   OFORI CANNOT CARRY HIS BURDEN OF DEMONSTRATING A
          LIKELIHOOD OF SUCCESS ON THE MERITS UNDER THE D.C. ANTI-
          SLAPP STATUTE AND HAS FAILED TO STATE A CLAIM ................................... 27

          A.    The Article Does Not Carry The Defamatory Meaning Ofori Ascribes
                To It ...................................................................................................... 27

          B.    The Statements Challenged by Ofori Constitute Privileged Reports of
                Judicial and Other Official Proceedings .................................................. 33

          C.    Ofori Cannot State a Claim for False Light or Intentional Infliction of
                 Emotional Distress ................................................................................ 38

CONCLUSION ................................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*3M Co. v. Boulter,*
    842 F. Supp. 2d 85 (D.D.C. 2012) ............................................................................. 23

*Abadian v. Lee,*
    117 F. Supp. 2d 481 (D. Md. 2000) .......................................................................... 32

*Aronson v. Dog Eat Dog Films, Inc.,*
    738 F. Supp. 2d 1104 (W.D. Wash. 2010) .............................................................. 24

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................................. 39

*Balestra-Leigh v. Balestra,*
    2010 WL 4280424 (D. Nev. Oct. 19, 2010) ........................................................... 24

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................. 39

*Bell v. Associated Press,*
    584 F. Supp. 128 (D.D.C. 1984) .............................................................................. 34

*Bible & Gospel Trust v. Twinam,*
    2008 WL 5245644 (D. Vt. Dec. 12, 2008) ............................................................ 24

*Blodgett v. University Club,*
    930 A.2d 210 (D.C. 2007) ........................................................................................ 38

*Brown v. Wimberly,*
    477 F. App'x 214 (5th Cir. 2012) ............................................................................ 24

*Browning v. Clinton,*
    292 F.3d 235 (D.C. Cir. 2002) ................................................................................. 39

*Buckley v. DIRECTV, Inc.,*
    276 F. Supp. 2d 1271 (N.D. Ga. 2003) ................................................................... 24

*Chandok v. Klessig,*
    632 F.3d 803 (2d Cir. 2011) ..................................................................................... 23

*Chapin v. Greve,*
    787 F. Supp. 557 (E.D. Va. 1992) ........................................................................... 33

*\*Chapin v. Knight-Ridder, Inc.,*
    993 F.2d 1087 (4th Cir. 1993) ................................................................ 29, 30, 31

*Chi v. Loyola University Medical Center*,
787 F. Supp. 2d 797 (N.D. Ill. 2011) .................................................................24

*Clawson v. St. Louis Post-Dispatch, L.L.C.*,
906 A.2d 308 (D.C. 2006) .................................................................................39

*Clyburn v. News World Communications, Inc.*,
705 F. Supp. 635 (D.D.C. 1989) ........................................................................39

*Cochran v. NYP Holdings, Inc.*,
58 F. Supp. 2d 1113 (C.D. Cal. 1998) ................................................................30

*Coles v. Washington Free Weekly, Inc.*,
881 F. Supp. 26 (D.D.C. 1995).............................................................26, 32, 34

*Communicty for Creative Non-Violence v. Pierce*,
814 F.2d 663 (D.C. Cir. 1987) ...........................................................................29

*Condit v. Dunne*,
2008 WL 2676306 (S.D.N.Y. July 8, 2008) .......................................................30

*Containment Technologies Group, Inc. v. American Society of Health System Pharmacists*,
2009 WL 838549 (S.D. Ind. Mar. 26, 2009)........................................................24

*Cooper v. Jackson*,
--- F. Supp. 2d ----, 2013 WL 1734801 (D.D.C. Apr. 23, 2013) ...........................2

*Dameron v. Washington Magazine, Inc.*,
779 F.2d 736 (D.C. Cir. 1985)......................................................................34, 36

*Disabled Rights Action Committee v. Las Vegas Events, Inc.*,
375 F.3d 861 (9th Cir. 2004) ...............................................................................6

*Ditton v. Legal Times*,
947 F. Supp. 227 (E.D. Va. 1996) .......................................................................37

*Farah v. Esquire Magazine, Inc.*,
863 F. Supp. 2d 29 (D.D.C. 2012).............................................................. *passim*

*Fleming v. AT&T Information Services, Inc.*,
878 F.2d 1472 (D.C. Cir. 1989)..........................................................................33

*Gardner v. Martino*,
563 F.3d 981 (9th Cir. 2009) ..............................................................................24

*Godin v. Schencks*,
629 F.3d 79 (1st Cir. 2010)................................................................................23

*Guilford Transportation Industries, Inc. v. Wilner*,
    760 A.2d 580 (D.C. 2000) ..................................................................29

*Hargrave v. Washington Post*,
    2009 WL 1312513 (D.D.C. May 12, 2009) .................................................34, 37

*\*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) ..................................................................38

*\*Janklow v. Newsweek, Inc.*,
    759 F.2d 644 (8th Cir. 1985) ..................................................................32

*\*Janklow v. Newsweek, Inc.*,
    788 F.2d 1300 (8th Cir. 1986) (en banc) ..................................................32

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
    838 F.2d 1287 (D.C. Cir. 1988) ..................................................................37

*Makaeff v. Trump University, LLC*,
    --- F.3d ----, 2013 WL 1633097 (9th Cir. Apr. 17, 2013) .................................24

*McFarlane v. Esquire Magazine*,
    22 Media L. Rep. (BNA) 2033 (D.D.C. June 8, 1994) ...................................37

*Monaco Entertainment Group v. City of El Paso*,
    No. EP-11-CV-561-DB (W.D. Tex. Aug. 29, 2012) .......................................24

*Newton v. National Broadcasting Co.*,
    930 F.2d 662 (9th Cir. 1991) ..................................................................32

*Q International Courier, Inc. v. Seagraves*,
    1999 WL 1027034 (D.D.C. Feb. 26, 1999) ...............................................34

*Riley v. Harr*,
    292 F.3d 282 (1st Cir. 2002) ..................................................................30

*Russell v. Krowne*,
    2010 WL 2765268 (D. Md. July 12, 2010) ...............................................24

*Sharpe v. District of Columbia*,
    860 F. Supp. 2d 61 (D.D.C. 2012) ..................................................................6

*Sherrod v. Breitbart*,
    843 F. Supp. 2d 83 (D.D.C. 2012) ..................................................................23, 26

*\*Shipkovitz v. Washington Post Co.*,
    571 F. Supp. 2d 178 (D.D.C. 2008) ..................................................................38, 39

*Southern Air Transport, Inc. v. American Broadcasting Cos.*,
   877 F.2d 1010 (D.C. Cir. 1989) ...................................................................29

*Tennenbaum v. Arizona City Sanitary Dist.*,
   799 F. Supp. 2d 1083 (D. Ariz. 2011) .........................................................24

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
   190 F.3d 963 (9th Cir. 1999) .......................................................................24

*Vance v. Chao*,
   496 F. Supp. 2d 182 (D.D.C. 2007) ...............................................................6

*Volm v. Legacy Health System, Inc.*,
   237 F. Supp. 2d 1166 (D. Or. 2002) ............................................................31

*Waldon v. Covington*,
   415 A.2d 1070 (D.C. 1980) ..........................................................................39

*Washington v. Smith*,
   893 F. Supp. 60 (D.D.C. 1995) ....................................................................39

*White v. Fraternal Order of Police*,
   707 F. Supp. 579 (D.D.C. 1989) ..................................................................30

*White v. Fraternal Order of Police*,
   909 F.2d 512 (D.C. Cir. 1990) ............................................................ *passim*

*Winder v. Erste*,
   --- F. Supp. 2d ----, 2012 WL 5863494 (D.D.C. Nov. 19, 2012) ..............2, 6

**STATUTES**

20 U.S.C. § 1092(f) ..........................................................................................15

20 U.S.C. § 1092(f)(13) ...................................................................................15

20 U.S.C. § 1681 ....................................................................................4, 16, 17

D.C. CODE § 16-5501(1)(A) .............................................................................25

D.C. CODE § 16-5501(1)(A)(i) .........................................................................24

D.C. CODE § 16-5501(1)(A)(ii) ........................................................................25

D.C. CODE § 16-5501(1)(B) .............................................................................25

D.C. CODE § 16-5501(3) ..................................................................................25

*D.C. CODE § 16-5502 ...........................................................................6, 21, 22

D.C. CODE § 16-5502(a) ...........................................................................................22

D.C. CODE § 16-5502(b) ...........................................................................................24

D.C. CODE § 16-5502(d) ...........................................................................................26

VA. CODE ANN. § 23-234 ..........................................................................................18

**RULES AND OTHER AUTHORITIES**

*FED. R. CIV. P. 12(b)(6) ................................................................................... *passim*

FED. R. EVID. 201 .......................................................................................................6

34 C.F.R. Part 106 ....................................................................................................17

34 C.F.R. Part 668 ....................................................................................................17

34 C.F.R. § 668.36 ....................................................................................................15

34 C.F.R. § 668.46(b)(11)(vi) ...................................................................................15

1 ROBERT D. SACK, SACK ON DEFAMATION § 7:3.5 (4th ed. 2010) ...........................37

Daniel Ferguson, *Dartmouth cancels classes after anti-rape protestors threatened with sexual assault and "execution,"* THE RAW STORY, Apr. 24, 2013, *available at* http://www.rawstory.com/rs/2013/04/24/dartmouth-cancels-classes-after-anti-rape-protesters-threatened-with-sexual-assault-and-execution/ ......................................5

F. HARPER & F. JAMES, THE LAW OF TORTS § 5.4 (1986) ............................................29

Tyler Kinkade, *Occidental College Sexual Assault Response Subject Of Federal Complaints*, HUFFINGTON POST, Apr. 19, 2013, *available at* http://www.huffingtonpost.com/2013/04/19/occidental-sexual-assault_n_3118563.html ............................................................................4

C. Krebs *et al.*, *The Campus Sexual Assault Study: Final Report* (NCJRS) (Oct. 2007), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf ..........................4

Richard Pérez-Peña, *et al.*, *2 More Colleges Accused of Mishandling Assaults*, N.Y. TIMES, Apr. 18, 2013, *available at* http://www.nytimes.com/2013/04/19/education/swarthmore-and-occidental-colleges-are-accused-of-mishandling-sexual-assault-cases.html...........................................................................................5

RESTATEMENT (SECOND) OF TORTS § 611 (1977).................................................37, 38

Jane Stancill, *Protestors support UNC student accused of honor code
 violations*, CHARLOTTE OBSERVER, Mar. 2, 2013, *available at*
 u-support-http://www.charlotteobserver.com/2013/03/02/3888280/protestersnc-
 chapel.html...............................................................................................................5

U.S. Dep't of Educ., *Campus Safety and Security Handbook, available at*
 http://rems.ed.gov/docs/ED_CampusSafetyAndSecurityReportingHandbook.pdf ...............15

In support of its Special Motion to Dismiss pursuant to the District of Columbia Anti-SLAPP Act of 2010, D.C. Code § 16-5501 *et seq*., and its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Better Publications, LLC respectfully submits this combined memorandum of points and authorities.

## **INTRODUCTION**

In this case, plaintiff seeks to hold liable – and to silence – an award winning newspaper publisher for an article that reported on official governmental actions and citizens' efforts to petition government officials, such that the article is at the core of the speech protected by the First Amendment.  Specifically, the article at issue chronicles two criminal rape investigations against plaintiff while he was a college student at the University of Virginia (as well as similar charges against other students), university hearings involving those charges, and a civil lawsuit against him.  The article explains how the results of those various official proceedings – in which plaintiff was not charged criminally, not held civilly liable, and not disciplined by the University, all of which the article accurately reported – led the mother of one of the alleged victims to successfully petition both the Virginia legislature and the United States Department of Education to change how sexual assault and rape cases are handled on college campuses.

The underlying events began in 2004, when plaintiff, Curtis Ofori, was accused of raping Kathryn Russell, then both students at the University of Virginia ("UVA").  Kathryn Russell sought to have Ofori prosecuted by the Commonwealth of Virginia and disciplined by the University.  When those efforts proved unsuccessful, she filed a civil lawsuit against him, which she later nonsuited.  Troubled by these results, Kathryn's mother, Susan Russell, started a website for university students who were alleged victims of rape.  Mrs. Russell successfully petitioned the United States Department of Education to order UVA to change its disciplinary

1

procedures, including to reverse strict rules prohibiting victims and witnesses from discussing the charges or proceedings.  And, believing that university police and health officials had botched the initial investigation into her daughter's case, she lobbied the Virginia legislature to require that rape cases be handled by local police, rather than by university officials.  A bill known as "Kathryn's Law," named for her daughter, was in part passed into law in March 2012 as a result of her efforts.

*The Hook*, published by defendant Better Publications, LLC (hereinafter, "*The Hook*"), is an award winning newspaper serving central Virginia.  It reported on all of these matters of clear public interest – as well as a second rape case against Ofori by another woman, whose description he does not challenge.[1]  Despite the fact that *The Hook*'s article accurately reported that Ofori was never criminally charged in connection with Russell's allegations, that the University disciplinary bodies found him not guilty, and that Kathryn Russell's civil lawsuit was voluntarily dismissed, Ofori has repeatedly demanded that the article be retracted and removed from *The Hook*'s website.  He has now filed this lawsuit demanding both millions of dollars and an injunction barring defendant from continuing to disseminate the article.

Unfortunately for Ofori, the law does not countenance such efforts to squelch reporting on these matters of clear public interest, including judicial and university proceedings, the handling of serious criminal charges by a public university and by prosecutors, rulings by the Department of Education, or efforts before the Virginia legislature to change state law.  Not only

---

[1] The Article at issue is attached as Exhibit 1 to the Declaration of Shaina D. Jones ("Jones Decl.").  In adjudicating this motion, the Court may properly take judicial notice of the Article, which is a document referenced in plaintiff's Complaint.  *See, e.g.*, *Cooper v. Jackson*, --- F. Supp. 2d ----, 2013 WL 1734801, at *4 (D.D.C. Apr. 23, 2013) ("In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice."); *Winder v. Erste*, --- F. Supp. 2d ----, 2012 WL 5863494, *14 n.8 (D.D.C. Nov. 19, 2012) (taking judicial notice of newspaper article).

does Ofori fail to state a claim under settled principles of defamation law, which has long

protected reports and commentary about such matters, but his claims are also barred by the D.C.

Anti-SLAPP Act, D.C. Code § 16-5501 *et seq.*

Indeed, enacted in 2010, the Anti-SLAPP Act was adopted to ensure that plaintiffs like

Ofori cannot silence reporting and commentary on such matters of public concern.  As the D.C.

Council's Committee on Public Safety and the Judiciary explained when it reported the bill, the

Anti-SLAPP Act exists to put a swift end to lawsuits such as this one, "the goal" of which to

"punish the opponent and intimidate them into silence," in other words, cases in which

"'*litigation itself*'" can become "the plaintiff's weapon of choice.'"  Jones Decl. Ex. (hereinafter,

"Ex.") 40 at 4 (committee report) (emphasis in original).  To achieve its purpose, the Anti-

SLAPP Act immunizes from liability speech "in furtherance of the right of advocacy on issues of

public interest," including articles about matters before any of the branches of government or

statements addressing matters of public concern.  Precisely in order to prevent litigants from

using litigation to silence critics, by inflicting substantial defense costs and subjecting them to

onerous discovery, the Act stays all discovery, provides for prompt dismissal with prejudice of a

SLAPP suit such as this one, and permits recovery by defendants of their attorneys' fees and

costs.  Only if Ofori is able to carry the heavy burden of demonstrating to this Court that he is

"*likely* to succeed on the merits" of each of his claims can this case be permitted to proceed.

Here, Ofori cannot meet that burden of establishing a likelihood of success on the merits

nor can he state a claim sufficient to overcome Federal Rule of Civil Procedure 12(b)(6) for at

least three reasons.  First, it is clear from the face of the Article that it does not, taken as a whole,

endorse the defamatory meaning ascribed to it by Ofori – *i.e.*, that he raped Kathryn Russell.

Rather, as the backdrop for describing her mother's opinion that the handling of her daughter's

case was flawed and her efforts to change how rape investigations are handled on college campuses, the Article accurately describes university proceedings, criminal charges and a civil lawsuit brought against him by Kathryn Russell, including that each of them ended in Ofori's favor.  Second, the statements Ofori challenges are privileged reports of official proceedings and records from, among others, the UVA Police Department, the UVA Sexual Assault Board, and Kathryn Russell's civil lawsuit against Ofori.  Finally, Ofori cannot survive dismissal under Rule 12(b)(6) or carry his burden of proving a likelihood of success on the merits of his "tag along" claims for false light invasion of privacy and intentional infliction of emotional distress, both of which are merely duplicative of his flawed claim for libel.  Because Ofori cannot establish a likelihood of success on the merits nor has he stated a claim, his complaint must be dismissed with prejudice.

## STATEMENT OF FACTS

**A.     The Ongoing Issue of Rape and Sexual Assault on College Campuses**

Rape and sexual assault on college campuses continues to be a serious issue.  A 2007 study prepared for the National Institute for Justice found that about one in five women are victims of completed or attempted sexual assault during college.[2]  There is also an ongoing public controversy over the handling of rape and sexual assault cases at colleges and universities nationwide, which has resulted in class action complaints,[3] as well as protests and counter-

---

[2] C. Krebs et al., The Campus Sexual Assault Study: Final Report (NCJRS) xiii (Oct. 2007), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf.

[3] As recently as last month, a group of thirty-seven students and faculty filed a 250-page complaint with the U.S. Department of Education's Office of Civil Rights, alleging that Occidental College maintained a hostile environment for sexual assault victims and violated federal Title IX laws against sexual discrimination.  *See* Tyler Kinkade, "Occidental College Sexual Assault Response Subject Of Federal Complaints," Huffington Post, Apr. 19, 2013, *available at* http://www.huffingtonpost.com/2013/04/19/occidental-sexual-assault_n_3118563.html. In just the past two years, students at Swarthmore, Amherst, Yale, Wesleyan, and

protests.[4]  *See also, e.g.*, Exs. 29-36 (news reports regarding issue).  And, as discussed below, in 2011, the Department of Education issued new guidelines to address the requirements for handling rape and sexual assault claims at universities receiving federal funding.  It is against this backdrop that the article at issue reported on this public controversy, the particular allegations of rape made by one student against her classmate, and how that university's handling of her case led a mother to advocate for reform.

**B.      Plaintiff Curtis Ofori and the Allegations of Rape Against Him**

Ofori attended the University of Virginia ("UVA") from approximately 2001 to 2005, receiving a bachelor's degree in accounting and economics in 2005.  Compl. ¶ 3.  In 2004, Ofori was accused of raping a UVA classmate, Kathryn Russell, while both were third year students.  *Id.* ¶ 6.

According to police investigative records, UVA disciplinary hearing records, and the civil lawsuit Russell later filed against Ofori, Kathryn Russell alleged that, on February 12, 2004, she and a group of friends attended a local Charlottesville bar, where she had a number of drinks, mingled with friends and spoke a few times to Ofori.  Ex. 17 ¶ 3 (Russell's civil complaint);

---

the University of North Carolina have also reportedly filed complaints with the Department of Education against their schools for failing to adequately protect student victims of sexual misconduct.  *See* Richard Pérez-Peña, et al., "2 More Colleges Accused of Mishandling Assaults," N.Y. Times, Apr. 18, 2013, *available at* http://www.nytimes.com/2013/04/19/ education/swarthmore-and-occidental-colleges-are-accused-of-mishandling-sexual-assault-cases.html.

[4] *See, e.g.*, Jane Stancill, "Protestors support UNC student accused of honor code violations," Charlotte Observer, Mar. 2, 2013, *available at* http://www.charlotteobserver.com /2013/03/02/3888280/protesters-support-unc-chapel.html; Daniel Ferguson, "Dartmouth cancels classes after anti-rape protestors threatened with sexual assault and 'execution,'" The Raw Story, Apr. 24, 2013, *available at* http://www.rawstory.com/rs/2013/04/24/dartmouth-cancels-classes-after-anti-rape-protesters-threatened-with-sexual-assault-and-execution/.

Ex. 2 at 4 (police report); Ex. 7 at 2:6-3:2 (UVA Sexual Assault Board statement).[5]  She had

known Ofori since high school, he had been in one of her UVA classes and the two had worked

on a project together for Phi Beta Lamda, an organization of student business leaders.  Ex. 17

¶ 5; Ex. 4 at 5 (report of police interview with Ofori).  Although Russell thought Ofori might

have been "'hitting on'" her at the bar, she told him "categorically that she ha[d] no intention of

any interaction with him," including because her "boyfriend [was] in Texas and she was not

looking for any other relationship or uncommitted physical sexual behavior."  Ex. 6 at 4:4-5,

5:11-21 (UVA Sexual Assault Board statement).

       Upon departing the bar at the end of the evening with one of her suitemates, Russell

stated she "received a cell phone call form Mr. Ofori requesting a ride to his residence on

Virginia Avenue.  Both women discussed his request and agreed."  Ex. 17 ¶ 8 (civil complaint);

Ex. 2 at 4 (police report) (same); Ex. 6 at 6:10-15 (UVA Sexual Assault Board statement)

(same).  According to Russell, after missing the turn for Ofori's residence, Ofori then asked to

_____

       [5] The Court may properly take judicial notice of (a) police reports and investigative
records; (b) records of the UVA Sexual Assault Board; (c) records from Kathryn Russell's civil
lawsuit; (d) records of the Department of Education and the Virginia legislature; (e) Susan
Russell's website; and (f) news reports and other public records.  These materials are properly
the subject of judicial notice on defendant's motion to dismiss without converting the motion
into one for summary judgment, as defendant is not offering these materials for the truth of the
matters asserted.  *See, e.g.*, Fed. R. Evid. 201; *Winder*, 2012 WL 5863494, at *14 n.8 (taking
judicial notice of *Washington Times* article); *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d
29, 35 (D.D.C. 2012) (taking judicial notice of Internet postings made not "for their truth, but
merely to show that those statements were made"); *Sharpe v. District of Columbia*, 860 F. Supp.
2d 61, 62 n.1 (D.D.C. 2012) (taking judicial notice of a search warrant and affidavit); *Vance v.
Chao*, 496 F. Supp. 2d 182, 184 n.1 (D.D.C. 2007) (court may take judicial notice of public
documents, such as court records, without converting motion to dismiss into motion for summary
judgment); *see also Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866
n.1 (9th Cir. 2004) (taking judicial notice of documents of state university).  In addition, under
the D.C. Anti-SLAPP Act, defendants are entitled to submit evidence either to make a prima
facie showing that "the claim at issue arises from an act in furtherance of the right of advocacy
on issues of public interest," or to rebut the plaintiff's attempt to demonstrate a likelihood of
success on the merits, without being limited to evidence that the Court may judicially notice.  *See*
D.C. Code § 16-5502.

stay in Russell's suite because his "roommate had brought someone over and he needed to stay elsewhere," to which Russell's roommate agreed.  Ex. 6 at 7:6-20 (UVA Sexual Assault Board statement); *see also* Ex. 2 at 4-5 (police report) (same); Ex. 17 ¶¶ 10-11 (civil complaint) (same). After arriving at their residence, Russell alleges that her suitemate "exited the car and went directly to her bedroom, leaving Ms. Russell alone with Mr. Ofori.  Ms. Russell was intoxicated and unable to drive Mr. Ofori home.  She retrieved an air mattress from the trunk of her vehicle for Mr. Ofori to sleep on in their living room."  Ex. 17 ¶ 11-12 (civil complaint); *see also* Ex. 2 at 5 (police report) ("Ms. Russell offered him a mattress for the floor.  She had a blow up inflatable mattress.  She told him 'Here's the floor.'").

According to Russell, as she was attempting to inflate the mattress in her own room to prevent waking anyone else, Ofori came in, grabbed her from behind and attempted to kiss her. Ex. 17 ¶ 14 (civil complaint) ("Ms. Russell took the mattress to her room to use the air pump to blow up the air mattress.  Mr. Ofori followed her into the room.  While Ms. Russell was attempting to fill the air mattress, Mr. Ofori grabbed her from behind several times.  Ms. Russell asked Mr. Ofori to leave the room."); Ex. 2 at 5 (police report) ("While she was fumbling with the mattress Mr. Ofori grabbed her at least 3 times in a bear hug, & tried to get her turned around and tried to kiss her.  Each time Ms. Russell wiggled out of his grip'"); Ex. 6 at 8:18-20 (UVA Sexual Assault Board statement) (Ofori "embraced her from behind," upon which "[s]he ducked out of the embrace; he backed off.  He attempted again to embrace her.").  According to Russell, she attempted to leave, but Ofori grabbed her and pushed her onto the bed.  Ex. 17 ¶¶ 16-17 (civil complaint) ("Ms. Russell again attempted to leave.  Mr. Ofori then positioned himself between Ms. Russell and the door.  He shut the door and turned out the light, staying between Ms. Russell and the door.  Mr. Ofori pushed Ms. Russell onto the bed."); Ex. 2 at 5 (police

7

report) ("Mr. Ofori picked her up and body slammed her on the bed.  Due to the amount of alcohol Ms. Russell had consumed the time span was a little fuzzy.  The lights went out immediately after she was body slammed on the bed.  She could tell he was jerking her clothes off quickly."); Ex. 6 at 9:2-5 (UVA Sexual Assault Board statement) ("He grabbed her from behind, wrapping her arms down, and lurched backward onto the bed.").

Russell alleges that Ofori then raped her, forced her to perform oral sex, and then raped her again.  Ex. 17 ¶¶ 19-21, 22 (civil complaint) ("Mr. Ofori engaged in sexual intercourse with Ms. Russell.  She repeatedly told him to stop what he was doing and that it was hurting her . . . . Mr. Ofori also forced Ms. Russell to perform oral sex that caused her to gag.  Mr. Ofori also forced Ms. Russell into sexual intercourse a second time."); Ex. 2 at 5 (police report) ("During the actual sex Act, Ms. Russell reported telling him he was hurting her more than once . . . [he] forced her to do oral sex. . . She was gagging so he quit.").  She asked Ofori to use a condom, at least for the first of the sexual acts.  Ex. 6 at 11:18-20 (UVA Sexual Assault Board statement) ("Thinking that she might at least prevent pregnancy or an STI, (and did not want him touching her) she asked if he had a condom."); Ex. 2 at 5 (police report) ("She insisted on a condom").

For his part, Ofori emphatically denies Kathryn Russell's allegations, contends that she "filed a false and misleading police report . . . claiming that she did not consent to having sex with Ofori," Compl. ¶ 6, and that he is not a "criminal rapist" or a "perpetrator of a sexual assault," *id.* ¶ 14.  *See also id.* ¶ 8 (describing her charges as a "false accusation").

**C.   The University Police Investigation of Russell's Rape Allegations and the Commonwealth's Attorney's Decision Not to Prosecute**

On February 16, 2004, Russell reported the incident to the University of Virginia Police Department, where her case was ultimately referred to Detective Janice Coles.  *See* Compl. ¶ 7. In her initial interview, Russell repeated the factual allegations of Ofori's alleged rape and sexual

assault described above.  Ex. 2 at 4-5 (police report).  Afterwards, Russell was given a physical

examination at the University's hospital emergency room.  *Id.* at 6-7.  Russell was told that they

could not perform a Physical Evidence Recovery Kit or "PERK" test, because she was beyond

the 72 hour window, *id.* at 7, and was frustrated because she "found the hospital experience

demeaning and humiliating."  Ex. 6 at 19:1-5 (UVA Sexual Assault Board statement).  Russell

claims that "[o]nly after she was finally dressed did they offer to do a blue dye test," to test for

any physical lacerations, but Russell "declined out of frustration" with the hospital's response

and the "emotional distress" she was under.  *Id.* at 19:5-7; *see also* Ex. 1 at 19 ("Not realizing the

purpose of the exam, and that it might provide the only physical evidence she'd have to prove

rape, Kathryn says she declined to disrobe a second time and undergo another exam.").[6]

On February 26, 2004 – ten days after the initial police interview with Russell – Officer

Coles called in Ofori.  He executed a written waiver of his Miranda rights, and "handed [the

officer] a typed statement he prepared" refuting Russell's allegations and denying that he raped

or sexually assaulted her.  Ex. 3 (waiver & Ofori statement).  He did so despite not having been

told in advance the interview concerned anything other than an "interaction."  As he later

explained under questioning before the UVA Sexual Assault Board:

> Q: Also when you first met with the police  . . . Was I correct in
> reading you took a written statement with you?
>
> MR. OFORI: Yes, the case details.
>
> Q: That is what you took?

---

[6] Following the incident, Russell had also gone to the University's Student Health Center
to obtain the Morning After pill.  Ex. 2 at 6 (police report).  She later alleged in her statement to
the UVA Sexual Assault Board that she was "frustrated with the help she was getting," and was
"feeling interrogated" by the health center staff.  Ex. 6 at 18:10-11 (UVA Sexual Abuse Board
statement).

MR. OFORI: That is exactly what I gave to the police department, yes.

Q: How did you know -- did the police officer when you spoke on the phone make clear what this was about or that it involved Katherine [*sic*]?

MR. OFORI: It was exactly -- my initial thought was like, what happened?  Is a dog missing?  Did I break something?  She just kept saying your interaction, your interaction.  Outside of being -- that it was that evening.  I was going, what happened?  I talked to my brother.  That's the only conclusion -- I was like, am I going to be able to come back after I talk to you?  She [Officer Coles] said it depends on what you tell me.

Q: You had the feeling that you were under suspicion for something?

MR. OFORI:  Yeah.  It was weird because I was like, what could it be?  And that is the only interaction I had.  If she's going to ask me this, that is what I am going off of.

Ex. 9 at 154:2–155:5.

On March 1, 2004, the University forwarded Russell's case reports to the Office of the Commonwealth's Attorney for Albemarle County for review to determine whether to criminally prosecute Ofori for rape.  *See* Compl. ¶¶ 7, 8.[7]  On March 19, 2004, Russell, her mother, and Officer Coles met with Deputy Commonwealth's Attorney Rick Moore, who stated that his office would not prosecute the case as a rape, but that, if she wished, Russell could "pursue assault and battery charges against Mr. Ofori."  Ex. 5 at 5 (police report).

---

[7] In his Complaint, Ofori alleges that it was Warner D. Chapman, the Commonwealth's Attorney for the City of Charlottesville, who reviewed Russell's case and decided against prosecuting Ofori.  Compl. ¶ 8.  It appears, however, that the charges were in fact evaluated by the Commonwealth's Attorney for Albemarle County.  *See, e.g.*, Ex. 4 (police report referencing referral to Albemarle County Commonwealth's Attorney's Office).  Given that the article at issue accurately reported that the Commonwealth's Attorney declined prosecution, any issue over which prosecutor's office passed on the charges is immaterial to the adjudication of defendant's motions.

**D.      UVA Sexual Assault Board Hearings**

Kathryn Russell reported the incident to UVA's Dean of Students, who initially "tried to persuade her to enter Mediation, rather than to go forward with" a Sexual Assault Board proceeding, but Russell declined.  Ex. 20 at 1.  As a result, the University's Sexual Assault Board, which is comprised of faculty, professional staff and students and which has the authority to suspend or permanently expel students found guilty, ultimately scheduled a hearing for May 10, 2004.  *See* Ex. 11 at 2 (Sexual Assault Board adjudication options); *see also* Compl. ¶ 9 (describing Sexual Assault Board panel).

During the all-day hearing, both Russell and Ofori presented prepared statements, elicited testimony from witnesses and presented evidence.  Compl. ¶ 9 (describing hearing).  The Board also arranged to have present a court reporter who prepared an official hearing transcript.  *See* Ex. 9.  At the outset of the hearing, the chair of the Board explained that Russell would bear the burden of "proving [her] charges with clear and convincing evidence," which the Chair defined as "evidence that creates in the panel members' minds a firm belief of conviction that she has proven the issue."  *Id.* at 6:3-10; *see also* Ex. 12 at 11 (2004 UVA Sexual Assault Board procedures).  In addition, Russell, as well as each of the witnesses who testified, were admonished by University officials prior, during, and after the hearing that, under the University's Honor Code, they were strictly prohibited from disclosing any information regarding the case, including its existence, and that they could face University disciplinary proceedings if they did so.  *See, e.g.*, Ex. 9 (transcript) at 6:12-23 ("All parties are reminded these proceedings are confidential and all testimony is within the expectation of the University of Virginia's honor system. . . .  Before testifying, each witness will be reminded of confidentiality of the proceedings and the fact that the honor system governs their testimony.").

11

At the hearing, Russell largely repeated the allegations described above.  For his part, Ofori submitted a statement in which he stated, *inter alia*, that "[n]ot all my actions would in a day-to-day situation be considered kosher" but "none of my actions broached or even swept near the arena of rape."  Ex. 8 at 3 (Ofori's April 23, 2004 statement); *see also id.* ("many of my actions if examined by the average person would be seen as ok, just with the suggestion to lighten up").  He further questioned "Ms. Russell's false claim of rape" because "she was the provider of contraception.  By providing the contraception she tacitly agreed to have sex and was a willing participant knowing that contraception would be used to engage in sex."  Ex. 7 at 2 (Ofori's Mar. 25, 2004 statement); *see also* Ex. 9 at 45:16-46:2 (transcript, quoting same from Ofori's statement).[8]

Following the hearing, the Sexual Abuse Board issued its findings, ultimately holding that, while it was "concerned about much of what was said during the hearing and believe that [Ofori] used very bad judgment," the panel was "not able to conclude by the clear and convincing level" that Ofori was "guilty of sexual assault under the University's definition," and rendered a finding that he was "not guilty."  *Id.* at 293:14-20; Ex. 10 (decision letter).  On July 12, 2004, Russell appealed the decision to the University's Judicial Review Board which, on October 18, 2004, declined to reconsider the Sexual Assault Board's conclusion, upon finding no error in procedure.  *See* Ex. 13 at 2-3 (Judicial Review Board Procedures for Appeals noting limited grounds for appeal); *see also* Compl. ¶ 10 (describing Board's composition and review).

---

[8] In addition to responding to Russell's allegations, Ofori's March 25, 2004 statement, which he styled "UVA v. Kathryn Lindsay Russell," appeared to contend that her filing of a purportedly false rape accusation constituted a violation of UVA's Honor Code and advocated that she face disciplinary action, including removal from the University, as a result.  *See* Ex. 7.

**E.      A Second Woman's Rape Allegations Against Ofori Are Heard by UVA's Sexual Assault Board**

According to a report issued by the Center for Public Integrity, in April 2005, during Ofori's senior year at UVA, a second female UVA student – Rebekah Hay, then a junior – filed a sexual assault complaint against Ofori.  Ex. 29 at 10.  According to that report, Hay recalled that, when she filed her complaint, UVA's then-Dean of Students said to her, "'I'm sorry to see this name come up again.'"  *Id.*  The Sexual Assault Board initially found Ofori guilty in that case, but that verdict was eventually overturned on appeal.  *Id.*  Because Ofori does not challenge the article at issue's description of this second case, it is not described in greater detail.

**F.      Russell's Civil Lawsuit Against Ofori**

In February 2006, Russell filed a three-count Motion for Judgment against Ofori in the Charlottesville City Circuit Court, alleging causes of action for Assault and Battery, Gross Negligence, and Negligence.  Ex. 15.[9]  In it, she detailed essentially the same factual allegations as stated in her complaint to University police and to the UVA Sexual Assault Board.[10]

In June 2006, while Ofori was still being sued as a "John Doe," *see* note 9 *supra*, Ofori, through his lawyer, offered to settle Russell's civil lawsuit against him for $10,000.00, "contingent upon the defendant's actual identity remaining under seal," together with all other court documents concerning the complaint, as well as an agreement that Russell "would not share information with any other similarly situated claimants."  Ex. 16.  Russell declined to settle, but in early 2007 she non-suited the case.  Ex. 18 (docket noting entry of non-suit).  When

---

[9] As originally filed in February 2006, the Motion for Judgment was styled as *Russell v. John Doe.  See* Ex. 15.  However, Russell amended her pleading in September 2006 to list Ofori by name as the defendant.  *See* Ex. 17.  The two pleadings are identical in all other respects.

[10] According to her Motion for Judgment, Russell transferred from UVA to Clemson University, from which she graduated in 2005, because "of her fear of seeing Mr. Ofori on campus" and "to avoid locations that would trigger thoughts of the attack."  Ex. 17 ¶ 26.

interviewed, she was quoted as saying she was unable to afford her attorney's fees, and was concerned that they would exceed any eventual recovery. *Id.* Ex. 1 at 21.

**G.    Susan and Kathryn Russell's Efforts to Change the Handling of Rape and Sexual Assault Allegations on College Campuses**

Soon after her daughter reported her allegations of rape against Ofori in 2004, Kathryn's mother, Susan Russell, began to advocate publicly on behalf of victims of alleged sexual assault and rape in a variety of ways.  As described below, each of Susan Russell's advocacy efforts focused on the handling of cases by University officials and the institutional interest in protecting the University's reputation, which often "send[s] the message that sexual assault is acceptable." Ex. 20 at 2.  She also vocally criticized the UVA Sexual Assault Board's procedures, including its requirement that rape victims remain silent about all proceedings and its application of a "clear and convincing evidence" standard.

**1.    Launching the Website, www.UVAVictimsOfRape.com**

In March 2004, Susan Russell launched the website www.uvavictimsofrape.com.  It states that "This website was created by a UVA Parent to inform Parents, Students, and Alumni about the University of Virginia's ineffective response to the crime of rape and sexual assault," and complains that the "University resolves Rape and Sexual Assault crimes as ADMINISTRATIVE MATTERS, not as FELONY CRIMES." *Id.*  The site further explains:

> This website began in mid-March 2004 when a mother and her young daughter realized that the University Police and staff were more interested in protecting the school's image than in protecting and assisting young victims of crime.  Our first course of action was to hand out 300 flyers to alert the students that the University was turning a blind eye to our problem and asking people to email their own personal stories with the hopes we would learn from them and perhaps bring change to the way sexual assaults were handled by the University.  Within days, over 100 women had emailed the one page website to let us know that they had been ignored by the administration when they reported that they had

been assaulted.  Clearly there was a need for a voice for all victims
of sexual assault at the University of Virginia.

*Id.*; *see also* Ex. 19.  After asking "Is it Honorable for a University to support Zero Tolerance for

Cheating but not for Rape?", the home page of the website criticizes a number of specific

University and law enforcement officials for their handling of Kathryn Russell's case, and then

asserts that Ofori, whose photograph is prominently featured, "raped young women at UVA."

*Id.*  To defendant's knowledge, Ofori has not filed any claims against Mrs. Russell arising from

that assertion on her website.

### 2.     Petitioning the Department of Education, and Its Finding that UVA Violated Federal Law in Its Handling of Kathryn Russell's Case

In November 2004, Susan Russell filed a complaint with the United States Department of

Education ("DOE"), alleging that the University of Virginia's policies for handling her

daughter's case violated the Jeanne Clery Disclosure of Campus Security Policy and Campus

Crime Statistics Act (the "Clery Act").[11]  In particular, Mrs. Russell alleged that the requirement

that her daughter and the witnesses not discuss the case or disclose the existence of the Sexual

Assault Board proceedings, under threat of disciplinary action pursuant to the University's

Honor Code, violated the Clery Act and effectively "prohibit[ed] the student body from knowing

if the Sexual Assault Board is appropriate and effective."  Ex. 20 at 1 (Clery Act Complaint).

---

[11] The Clery Act, codified at 20 U.S.C. § 1092(f) with implementing regulations at 34 C.F.R. § 668.36, is a federal law that requires colleges and universities across the United States to disclose certain information about crime on and around their campuses.  *See also* United States Dep't of Educ., "Campus Safety and Security Handbook" (*available at* http://rems.ed.gov/docs/ED_CampusSafetyAndSecurityReportingHandbook.pdf).  Enforced by the United States Department of Education, the law is tied to an institution's participation in federal student financial aid programs and applies to both public and private institutions of higher education.  *See* 20 U.S.C. § 1092(f)(13).  The Act also provides a Campus Sexual Assault Victim's Bill of Rights.  *See* 34 C.F.R. § 668.46(b)(11)(vi).

The controversy surrounding UVA's policy received substantial media coverage, and resulted in student protests, including a silent protest by over 400 UVA students who wore gags to represent UVA's silencing of sexual assault victims.  Ex. 33.  In March 2005, after Russell's complaint was filed, UVA administrators submitted to the Department of Education a revised policy that eliminated specific secrecy requirements, stating instead that the University "neither encourages nor discourages further disclosure."  Ex. 29 at 8.

In November 2008, four years after Russell's Clery Act complaint was filed, and notwithstanding the University's 2005 revision to its policy, the Department of Education ruled that the University had violated the Act by threatening alleged victims of sexual assault, including Kathryn Russell, with punishment if they spoke publicly about their cases.  Ex. 21 (DOE final determination).  Specifically, the Department held that the "University cannot require an accuser to agree to abide by its non-disclosure policy, in writing or otherwise, as a pre-condition to accessing judicial proceeding outcomes and sanction information under the Clery Act."  *Id.* at 2.  Although the Department indicated it would "not impose any fines or other sanctions at this time," it cautioned that "any subsequent violations of the Clery Act will result in a referral for the imposition of a civil penalty of up to $27,500 per infraction."  *Id.* at 3.

In addition to her Clery Act complaint, Susan Russell also publicly argued that the University's Sexual Assault Board applied the wrong standard of proof in adjudicating its sexual assault cases, including her daughter's, by requiring alleged victims to prove their assault by "clear and convincing evidence."  *See* Ex. 34.  She claimed that, according to federal anti-discrimination laws under Title IX, 20 U.S.C. § 1681, *et seq.*, universities are required to use the

less stringent "preponderance of the evidence" standard. *Id.*[12] In April 2011, the Department of Education's Assistant Secretary for Civil Rights issued detailed agency guidance concerning the handling of cases of sexual violence at educational institutions, Ex. 22, including to require them to apply the "preponderance of the evidence standard" in such cases, *id.* at 11. In response, in 2011, UVA overhauled its sexual assault policy, among other things, changing the standard of proof to "preponderance of the evidence." Ex. 14 at 14.[13]

### 3. Petitioning the Virginia Legislature, and Its Passage of Legislation Regarding Claims of Rape and Sexual Assault on College Campuses

On January 21, 2011, following lobbying efforts by Susan Russell, then-Virginia House of Delegates member Paula Miller (D-Norfolk) introduced Virginia House Bill No. 2490, known as "Kathryn's Law," before the Virginia General Assembly. *See* Ex. 23 (Delegate Miller's explanation of background of "Kathryn's Law"). As presented, Kathryn's Law required the chief law enforcement officer of a public or private institution of higher education to report the death or an alleged rape of any person on campus property to the local law enforcement agency of the locality in which the institution is located. Ex. 24 (HB 2490, as introduced). The local

---

[12] Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of federal financial assistance. Ex. 22 at 1 (DOE 2011 guidance). Under DOE policy, "[s]exual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX," and sexual violence "refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent," *id.* at 1; *see also id.* at 2 n.3 (noting in that regard that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol"). *See also* 34 C.F.R. Part 668, Subpt. D, App. A (Clery Act implementing regulations which define forcible sex offenses to include any sexual act directed against another person, forcibly and/or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent).

[13] The updated policy also provided that consent could not be obtained by "taking advantage of the Incapacitation of another." Ex. 14 at 3.

law enforcement agency would then assume primary responsibility for leading the investigation, with cooperation from the institution of higher education.  *Id.*

The bill was referred to the Subcommittee for Militia, Police and Public Safety, which it in turn forwarded to the Virginia State Crime Commission, the criminal justice agency within the legislative branch with the authority to study, report and make recommendations on crime bills. On November 16, 2011, the Commission presented its findings, *see* Ex. 27 (Commission report); Ex. 25 (Commission agenda), and Susan and Kathryn Russell testified along with sixteen other witnesses – including several other women who had been victims of rape or sexual assault, the parent of a slain Virginia Tech student, and the mother of slain student from Tennessee, who had successfully lobbied for a similar bill to be passed in that state.  *See* Ex. 26 (Russells' testimony); Exs. 35-36 (news reports).  On December 6, 2011, the Commission reviewed the bill, adopted certain portions of the original draft, while rejecting others, and referred it back to the Legislature, which passed the revised bill.  As ultimately signed into law as House Bill 965 ("HB 965") on March 30, 2012, and codified at Virginia Code § 23-234, the law requires university police to enter into "mutual aid agreements" with local law enforcement when investigating campus rape and murder cases.   Ex. 28 (final legislation, as passed).  This accomplished a part of the Russells' goal of removing sole responsibility for the investigation of such crimes from campus police departments under the control of officials who, in their view, may both lack proper training and have institutional interests other than holding perpetrators accountable.  *Id.*

## H.    *The Hook* and the Article at Issue

Based in Charlottesville, Virginia, *The Hook* is published weekly by defendant and describes itself as the largest independent newspaper in Central Virginia, publishing both in print and online and covering social, political, and economic issues in the central Virginia area.

http://www.readthehook.com/.  Explaining that it "prides itself on informing the citizens of

Charlottesville of the hot and important stories in the community," *The Hook* has won over 130

awards for journalism, including multiple awards by the Virginia Press Association.

http://www.readthehook.com/awards.

On December 7, 2011, *The Hook* published an article, titled "Unsilenced: How this

mother fought to protect her daughter, and yours" (the "Article").  Written by senior editor

Courteney Stuart,[14] and published while Kathryn's Law was under consideration by the Virginia

Crime Commission, the Article reported on Susan Russell's various efforts, described above, to

change the handling of rape and sexual assault charges on college campuses.[15]  The Article also

described both her daughter's and Rebekah Hay's various proceedings against Ofori that had

served as a catalyst for Mrs. Russell to become a citizen activist *and* the fact that neither of their

charges ultimately resulted in a finding against him in any forum.[16]  Specifically, the Article

accurately reported that:

- Russell filed a police report, a disciplinary complaint with UVA and a civil lawsuit against Ofori for rape and sexual assault.  Ex. 1 at 18, 19, 21.

- "Prosecutors [in the Commonwealth's Attorney's Office] said there wasn't enough evidence to take the case."  *Id.* at 18.

---

[14] Stuart is an award-winning journalist with more than 16 years of experience, including the past 11 years serving as a writer and editor for *The Hook*.  Stuart is the recipient of 21 journalism awards from the Virginia Press Association.

[15] Well prior to publication of the Article, Kathryn Russell's story had already been the subject of national media coverage, including a multi-part report by the Center for Public Integrity, to which the Article refers, a broadcast on the CBS Early Show, and articles in the *Richmond Times-Dispatch* and *Cosmopolitan* magazine.  Exs. 29, 30, 31, & 32.

[16] The Article also reported on rape and sexual assault allegations against others, as well as a sexual assault allegation against Ofori's brother.  None of these aspects of the Article is challenged by Ofori in this action.

- "UVA's Sexual Assault Board" issued "a not guilty verdict after hearing from Kathryn and the man she accused." *Id.* at 18; *see also id.* at 23 ("there wasn't any conviction or suspension. . . .").

- Russell ultimately nonsuited her civil lawsuit against Ofori in Charlottesville Circuit Court, explaining that "the overwhelming expense coupled with an attorney's advice that even if she were victorious, she likely wouldn't receive enough money to cover her legal expenses, led her to withdraw the Charlottesville suit." *Id.* at 21.

- Before it was dismissed, Ofori offered Russell $10,000 to settle the civil lawsuit, which she declined. *Id.* at 23.

- "Ofori, who is a student at Wharton School of Business at the University of Pennsylvania, did not respond to *The Hook*'s emailed request for comment or to emails sent to a consulting company he heads." *Id.* at 21; *see also* Ex. 37 (emails to Ofori and his brother).

## I.   Ofori's Response to the Article

Ten months after the Article was published, counsel for plaintiff forwarded defendant a letter dated October 11, 2012, demanding, *inter alia*, that *The Hook* retract the Article in its entirety.  On October 23, 2012, through its undersigned counsel, *The Hook* declined, explaining that the Article was not actionable under both the common law and the First Amendment. Ex. 38.  However, believing that more speech would be an appropriate way to address Ofori's concerns, it offered to clarify any facts in the Article if Ofori would provide it the basis for doing so, or to publish his written response to the Article.  *Id.*  By letter dated October 26, 2012, Ofori's counsel refused that invitation, and instead attached a draft complaint, renewing his demand, *inter alia*, that *The Hook* fully retract the Article.  By letter dated November 6, 2012, *The Hook* declined that demand, noting that it was "unfortunate" that Ofori had "not responded to *The Hook*'s invitation to provide a statement or further information/documentation," and had "instead threatened litigation."  Ex. 39.

On December 5, 2012, Ofori filed this action, asserting causes of action for libel, false light invasion of privacy, and intentional infliction of emotional distress.  Compl. ¶¶ 15-34. Ofori's Complaint seeks two million dollars in compensatory and punitive damages, and requests that the Court permanently enjoin *The Hook* from further publishing the Article.  *Id.* at 8.  Close to four months later, on March 28, 2013, the Complaint was served on *The Hook*, which now brings the instant motions.  Because Ofori's action is subject to the D.C. Anti-SLAPP statute (Part I *infra*), and because settled law compels a finding that the Article is not actionable as a matter of law (Part II *infra*), the case should be dismissed with prejudice under both the Anti-SLAPP statute and Federal Rule of Civil Procedure 12(b)(6).

## ARGUMENT

### I.      THE IMMUNITY AFFORDED BY THE D.C. ANTI-SLAPP STATUTE APPLIES TO OFORI'S ACTION.

As we explain in Part I, the District of Columbia's Anti-SLAPP statute, D.C. Code § 16-5501 *et seq*. ("the Act"), provides a substantive protection from lawsuits, such as this one, arising out of "acts in furtherance of the right of advocacy on issues of public interest," which Ofori can overcome only by satisfying the heavy burden of demonstrating to this Court that he is "*likely* to succeed on the merits" of his claims.  Although not *The Hook*'s burden to do so, we explain in Part II several reasons why Ofori is unable to meet his burden – and also why the Complaint fails to state a claim under Rule 12(b)(6) – such that his complaint must be dismissed, promptly and with prejudice.

#### A.      The Anti-SLAPP Statute Provides Broad Immunity.

The terms of the protection conferred by the Anti-SLAPP Act are unambiguous, and their application to the facts of this case is straightforward.  The operative provisions of the Act insofar as they relate to this motion are set forth in Section 16-5502, which provides:

> (a) A party may file a special motion to dismiss any claim arising
> from an act in furtherance of the right of advocacy on issues of
> public interest within 45 days after service of the claim.[17]
>
> (b) If a party filing a special motion to dismiss under this section
> makes a prima facie showing that the claim at issue arises from an
> act in furtherance of the right of advocacy on issues of public
> interest, *then the motion shall be granted* unless the responding
> party demonstrates that the claim is likely to succeed on the merits,
> in which case the motion shall be denied.

D.C. Code § 16-5502 (emphasis added).  The Act further provides that, "[i]f the special motion

to dismiss is granted, dismissal shall be with prejudice."  *Id*.  In other words, defendant bears the

burden on this motion of showing only that Ofori's claims arise from the type of advocacy

protected by the Act.  If so, then the Act *requires* that the complaint be dismissed *with prejudice*.

The only exception to the protection thus conferred is in the circumstance in which a plaintiff

such as Ofori meets the heavy burden imposed by the Act of proving that he is *likely* to succeed

on the merits of his claims.

It is without question that D.C.'s Anti-SLAPP Act applies to Ofori's claims.  Indeed, the

Act's legislative history confirms that the legislation is designed to put an end to just such

lawsuits aimed at stifling speech about matters of public concern:

> Such lawsuits, often referred to as strategic lawsuits against public
> participation – or SLAPPs – have been increasingly utilized over
> the past two decades as a means to muzzle speech or efforts to
> petition the government on issues of public interest.  Such cases
> are often without merit, but achieve their filer's intention of
> punishing or preventing opposing points of view, resulting in a
> chilling effect on the exercise of constitutionally protected rights.

Ex. 40 at 1 (committee report).  This Complaint clearly fits within this type of suit, as it seeks to

"muzzle speech," here about "efforts to petition the government on issues of public interest."  To

---

[17] The complaint was served on March 28, 2013, and the motion is being timely filed
within 45 days of service as required by D.C. Code § 16-5502(a).

22

combat these types of suits, the Anti-SLAPP Act "provides a defendant to a SLAPP with rights to expeditiously and economically dispense [with] litigation aimed to prevent their engaging in constitutionally protected actions on matters of public interest." *Id.* at 4.

Because D.C.'s Anti-SLAPP statute confers a substantive protection under District of Columbia tort law, it applies in federal court. *See, e.g.*, *Farah*, 863 F. Supp. 2d at 36 & n.10 (invoking decisions of the First, Fifth and Ninth Circuits applying anti-SLAPP statutes as substantive protections of state law and dismissing claims for defamation and related torts under the D.C. Act). As Judge Leon concluded in *Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 (D.D.C. 2012), *appeal docketed*, No. 11-7088 (D.C. Cir. Aug. 29, 2012) (argued March 15, 2013), "the legislative history make[s] clear that the D.C. Anti-SLAPP Act is substantive." As the Court further explained, "the statutory text" also "supports the conclusion that the statute is substantive." *Id.* at 85 n.4. For example, the Act "shifts the burden of proof to the plaintiff to show her claims are likely to succeed," and "'it is long settled that the allocation of [the] burden of proof is substantive in nature and controlled by state law.'" *Id.* (quoting *Godin v. Schencks*, 629 F.3d 79, 89 (1st Cir. 2010)). Similarly, the Act provides for an award of "attorneys' fees and costs to the prevailing party," and "such statutory provisions are substantive in nature" as well. *Id.*; *see also Farah*, 863 F. Supp. 2d at 36 n.10 ("It was certainly the intent of the D.C. Council and the effect of the law . . . to have substantive consequences.").[18]

---

[18] One judge on this court has held that the Act would not apply in federal court, *see 3M Co. v. Boulter*, 842 F. Supp. 2d 85 (D.D.C. 2012), and, although that case had been appealed and consolidated for argument with the appeal in *Sherrod*, the *3M* appeal has now been dismissed. Thus, the D.C. Circuit is expected to address the SLAPP statute in connection with appeals of *Sherrod* and *Farah*, both of which are pending before the Circuit (*Sherrod* was argued on March 15, 2013 and *Farah* is fully briefed). Consistent with the reasoning of *Sherrod* and *Farah*, the overwhelming majority of federal courts – including every federal court of appeal to consider the issue – has applied more than a dozen different anti-SLAPP statutes like D.C.'s as substantive protections of state law. *See Godin*, 629 F.3d at 91-92 (Maine statute); *Chandok v. Klessig*, 632

### B.   Ofori's Complaint Triggers the Anti-SLAPP Immunity.

The Anti-SLAPP "Act is broad." *Farah*, 863 F. Supp. 2d at 36.  To invoke the protection afforded by the Act, *The Hook* need only make "a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest."  D.C. Code § 16-5502(b).  The statutory definition of such an act includes three prongs, any one of which is sufficient to trigger the application of the statute here.

**First**, the Act applies to "[a]ny written or oral statement" made "[i]n connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."  D.C. Code § 16-5501(1)(A)(i).  The Article plainly focuses on legislative proceedings before the Virginia General Assembly and the Virginia Crime Commission, executive branch proceedings before the UVA Sexual Assault Board and the United States Department of Education, and judicial proceedings in the Virginia Circuit Court.  It cannot be seriously disputed that an Article that describes in detail both official proceedings against Ofori and others, and Susan and Kathryn Russell's efforts to petition both the

---

F.3d 803 (2d Cir. 2011) (if satisfied, New York statute would apply); *Brown v. Wimberly*, 477 F. App'x 214, 216 (5th Cir. 2012) (Fifth Circuit "has adopted the use of the [anti-SLAPP] statute in federal court") (Louisiana statute); *Gardner v. Martino*, 563 F.3d 981, 991 (9th Cir. 2009) (Oregon statute); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970-73 (9th Cir. 1999) (California statute); *Tennenbaum v. Arizona City Sanitary Dist.*, 799 F. Supp. 2d 1083 (D. Ariz. 2011) (Arizona statute); *Buckley v. DIRECTV, Inc.*, 276 F. Supp. 2d 1271 (N.D. Ga. 2003) (Georgia statute); *Chi v. Loyola Univ. Med. Ctr.*, 787 F. Supp. 2d 797 (N.D. Ill. 2011) (Illinois statute); *Containment Techs. Grp., Inc. v. Am. Soc'y. of Health Sys. Pharmacists*, 2009 WL 838549 (S.D. Ind. Mar. 26, 2009) (Indiana statute); *Russell v. Krowne*, 2010 WL 2765268 (D. Md. July 12, 2010) (Maryland statute); *Balestra-Leigh v. Balestra*, 2010 WL 4280424 (D. Nev. Oct. 19, 2010), *aff'd on other grounds*, 471 F. App'x 636 (9th Cir. 2012) (Nevada statute); *Monaco Entm't Grp. v. City of El Paso*, No. EP-11-CV-561-DB (W.D. Tex. Aug. 29, 2012) (Texas statute); *Bible & Gospel Trust v. Twinam*, 2008 WL 5245644 (D. Vt. Dec. 12, 2008) (Vermont statute); *Aronson v. Dog Eat Dog Films, Inc.*, 738 F. Supp. 2d 1104 (W.D. Wash. 2010) (Washington statute); *but see Makaeff v. Trump University, LLC*, --- F.3d ----, 2013 WL 1633097 (9th Cir. Apr. 17, 2013) (Kozinski and Paez, JJ., concurring) (applying California statute pursuant to binding Circuit precedent, but urging reconsideration of *Newsham en banc*).

Department of Education and the Virginia legislature to effectuate changes in the way rape and sexual assault cases are handled on college campuses, is a written statement made in connection with official proceedings.

**Second**, the Anti-SLAPP statute applies to any "written or oral statement" made in "a place open to the public or a public forum in connection with an issue of public interest." D.C. Code § 16-5501(1)(A)(ii). A newspaper article, particularly published online, qualifies as "a "'written . . . statement'" made in a "'place open to the public or a public forum.'" *Farah*, 863 F. Supp. 2d at 38 (quoting D.C. Code § 16-5501(1)(A) and applying provision to blog post). With respect to the second part of this prong, the Act defines an "[i]ssue of public interest" to include, *inter alia*, "an issue related to health or safety . . . or community well-being." D.C. Code § 16-5501(3). Because the Article principally addresses rape and sexual assault on college campuses, which directly affects the health, safety and well-being of college students – particularly when the very issue of whether universities are properly equipped to investigate such cases was before the Virginia General Assembly at the time of the Article's publication – it indisputably involves "an issue related to health, safety . . . [or] community well-being."

**Third,** the Anti-SLAPP statute applies to "expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest." D.C. Code § 16-5501(1)(B). By definition, the Article constitutes expression that both "involves petitioning the government," including the Virginia legislature and the Department of Education, and "involves communicating views to members of the public in connection with an issue of public interest," including as is pertinent here issues "related to health or safety . . . or community well-being." *Farah*, 863 F. Supp. 2d at 37, 38 (blog post

about "dispute over whether President Obama qualifies by birthright to be President" satisfies this prong).

    **C.**    **To Overcome the Statutory Immunity and Avoid Dismissal, Ofori Must Demonstrate that He is Likely to Succeed on the Merits of His Claims.**

Having satisfied its burden of showing that Ofori's claims arise "from an act in furtherance of the right of advocacy on issues of public interest," the Act unambiguously provides that *The Hook*'s special motion to dismiss "shall be granted," and with prejudice. D.C. Code §§ 16-5502(b) & (d). *The Hook* need do nothing more to obtain the requested relief. Ofori may avoid that result only by carrying the heavy burden imposed on him by the Act of successfully demonstrating that his claims are "*likely* to succeed on the merits." *Id.* (emphasis added); *see Farah*, 863 F. Supp. 2d at 37, 39 (granting anti-SLAPP motion to dismiss claims for defamation and false light where defendants "made a prima facie showing that the [claims] arose from speech in furtherance of the right of advocacy on issues of public interest and because Plaintiffs have failed to demonstrate that their claims are likely to succeed on the merits").

Under the Act, it is Ofori's burden to prove that he is likely to succeed on *each* element of his defamation claim. *See Sherrod*, 843 F. Supp. 2d at 85 n.4 ("'Unlike in the Rule 12(b)(6) Motion – where [plaintiff] is entitled to certain inferences – here, [he] bears the burden of demonstrating that [his] claims are likely to succeed.'") (citation omitted). "To prevail in a defamation suit, [plaintiff] must prove that the statements complained of are i) defamatory; ii) capable of being proven true or false; iii) 'of and concerning' the Plaintiff; iv) false and v) made with the requisite degree of intent or fault." *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996). In addition, where privileges or other "common law and constitutional protections" shield speech about "issues of public interest," the plaintiff cannot establish his claim. *Id.* (dismissing claim based on, *inter*

*alia*, privilege for reports of official proceeding).  Ofori cannot satisfy this burden and his false

light and intentional infliction of emotional distress claims fail as well.

Defendant is not required to do anything more at this juncture, because the Act requires

dismissal unless *plaintiff* can satisfy the high burden of establishing a likelihood of success on

the merits.  However, because defendant is contemporaneously moving to dismiss under Rule

12(b)(6), the following section addresses several grounds demonstrating that Ofori has failed to

state a claim and, as a result, also demonstrates why Ofori is unable to satisfy his burden of

establishing a likelihood of success on the merits.  Because Ofori is unable to carry his burden

under the Act, *The Hook* is fully entitled to shelter under the protection it confers.

## II. OFORI CANNOT CARRY HIS BURDEN OF DEMONSTRATING A LIKELIHOOD OF SUCCESS ON THE MERITS UNDER THE D.C. ANTI-SLAPP STATUTE AND HAS FAILED TO STATE A CLAIM.

### A. The Article Does Not Carry The Defamatory Meaning Ofori Ascribes To It.

On its face, the Article accurately reports the outcome of each set of charges or

proceedings against Ofori, stating that: (a) "[p]rosecutors said there wasn't enough evidence to

take the [criminal] case," Ex. 1 at 18; (b) "UVA's Sexual Assault Board agreed, issuing a not

guilty verdict after the hearing," *id.*; (c) there is no "conviction against him," *id.*; (d) the

Assistant Commonwealth's Attorney "explained there wasn't enough evidence for local

prosecutors to take the case," *id.* at 19; (e) like another UVA student, Ms. Russell "was told by

prosecutors that her case was unwinnable," *id.* at 20; (f) Ms. Russell sued Ofori in 2006, but then

dropped the case, *id.* at 21; and (g) a second sexual assault complaint was filed against Ofori and

the finding against him was overturned on appeal, *id.* at 22.  The Article also accurately reports

the Russells' oft-publicized view that, notwithstanding the findings in Ofori's favor, he was

actually guilty and the procedures used by the investigators and the University were ultimately

inadequate to establish his guilt.  *Id.*

27

Unable to pinpoint any material false fact in the Article, the Complaint instead strains to assert a claim based on an unstated *implication* allegedly conveyed by the true facts presented – namely, that the Article "portray[s] him as a criminal rapist and perpetrator of sexual assault." Compl. ¶ 14.  He also points to several isolated statements from the Article reflecting the Russells' position, as further evidence that the Article conveys such an implication:

- "[T]he idea that her child's assailant would get away without any punishment sparked within [Mrs. Russell] a transformation from anguished mother into fearless victim's advocate."

- "If mother and daughter initially expected the perpetrator would be brought to justice, however, they were both wrong."

- "[Mrs. Russell] says there's only one thing that will bring her peace: the arrest and conviction of Curtis Ofori."[19]

- A passage describing the otherwise true fact that Ofori offered to settle Kathryn Russell's civil suit for $10,000, quoting her as saying "It was insulting."

- Describing how Mrs. Russell's website prominently accuses Ofori of raping her daughter, noting that he has not initiated a defamation lawsuit against her, quoting her as asking "What does that tell you?", and quoting a legal analyst noting that "the placement of Ofori's name and likeness [on that website] certainly could prompt a civil suit for libel, but it would also invite further scrutiny of incidents Ofori might prefer not to revisit" because they would be at issue since "'[t]he truth . . . is a valid defense."

Compl. ¶ 14(a)-(c), (k)-(l); *see also id.* ¶ 20 (asserting that Article is actionable because it "imput[es] to Ofori the commission of a criminal offense or offenses").[20]  However, when the Article is viewed in its entirety – as the Court is obliged to do – neither the overall Article nor these isolated statements is sufficient, as a matter of law, to carry the defamatory implication alleged by Ofori.

---

[19] The next sentence makes clear that:  "It's peace she's unlikely to find."  Ex. 1 at 18.

[20] The other isolated statements included in Ofori's complaint are addressed in note 23 *infra* and in next sections.

Whether a challenged article is "capable of conveying" the defamatory meaning alleged by plaintiff is an issue that "the courts are charged with the responsibility of determining" as a matter of law.  *See White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990) (citing *Southern Air Transp., Inc. v. American Broad. Cos.*, 877 F.2d 1010, 1013-14 (D.C. Cir. 1989)); *see also Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993).  In determining whether statements are capable of bearing a defamatory meaning, the entire publication "must be taken as a whole, and in the sense which it would be understood by the readers to whom it [is] addressed."  *Cmty. For Creative Non-Violence v. Pierce*, 814 F.2d 663, 671 (D.C. Cir. 1987) (citation omitted); *see also White*, 909 F.2d at 526 (court must "examine the entire context" in making this determination).

When the alleged defamation is by implication, as here, "careful exegesis" is necessary "to ensure that imagined slights do not become the basis for costly litigation."  *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000); *see also White*, 909 F.2d at 519 (the Court "must be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonable capable of sustaining such meaning").  This is particularly true at the pleadings stage, where implication claims must be subjected to close scrutiny to avoid the chilling impact on admittedly true speech caused by burdensome litigation and intrusive inquiry into the editorial process.  *See Chapin*, 993 F.2d at 1092-93 ("because the constitution provides a sanctuary for truth, a libel-by implication plaintiff must make an especially rigorous showing").

As the Court of Appeals has made plain, "'[t]he usual test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the communication *to have been intended* in the defamatory sense.'"  *White*, 909 F.2d at 519 (quoting F. Harper & F. James, *The Law of Torts* § 5.4 (1986)); *see also id.* at 520 (publication is

only actionable if, "by the particular manner or language in which the true facts are conveyed," it "supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference") (emphasis in original).  In *White*, the Court offered an instructive example to illustrate this "important, but subtle, point":

> If a newspaper accurately reported that an individual was arrested and charged with a crime, a reader could reasonably infer – *i.e.*, guess, surmise, or derive as a probability, that the individual actually committed the crime.  However, unless the newspaper article, considered as a whole, in context, could be reasonably understood to express that the individual in fact committed the crime, the newspaper report would not be actionable, questions of privilege aside.

707 F. Supp. 579, 589 & n.12 (D.D.C. 1989), *aff'd*, 909 F.2d 512 (D.C. Cir. 1990).  Thus, in *White*, even though the defendant "reported true facts from which a reader might infer that [plaintiff] used drugs," no claim for libel existed because the court could not find that "it would be reasonable for a reader to conclude that [defendant] *intended* the defamatory inference."  909 F.2d at 526.  *See also Chapin*, 993 F.2d at 1092-93 (publication's "language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author *intends* or *endorses* the inference") (emphasis added).[21]

---

[21] Thus, a reasonable reader would understand that the Article was describing the Russells' own constitutionally protected opinion that, notwithstanding the findings in Ofori's favor, the proceedings were flawed and that Ofori was guilty.  *See, e.g.*, *Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1116-17 & n.2 (C.D. Cal. 1998), *aff'd*, 210 F.3d 1036 (9th Cir. 2000) (statement that Johnnie Cochran "set free a celebrity who slaughtered his ex-wife" was protected opinion, emphasizing that "[a]ll are free to disagree with [the author's] views about . . . O.J. Simpson's responsibility for his ex-wife's death, but [her] right to express her opinion on the subject is absolutely protected by the First Amendment"); *Condit v. Dunne*, 2008 WL 2676306, at *1, 7 (S.D.N.Y. July 8, 2008) (statement that plaintiff "knows more about [Chandra] Levy's murder than he has ever said" protected as opinion because statement was "weighing in on the public debate" regarding murder) (citation omitted).  As such, "[h]aving disclosed the facts upon which [the Russells' opinion] is based," *The Hook* "is entitled to report" those opinions in describing this controversy.  *Riley v. Harr*, 292 F.3d 282, 297-98 (1st Cir. 2002) (author permitted to report third parties' view that plaintiff's actions in dumping toxic chemicals on their properties "had caused the death of the [their] children").

Here, Ofori alleges that the Article in effect charges him with rape and sexual assault because it examined the Russells' ongoing questions about the results in his favor.  *See, e.g.*, Compl. ¶ 14(k) (challenging Article's quotation of Mrs. Russell's question, "What does that tell you?" in connection with Ofori's failure to initiate a defamation action arising from her website).[22]  But, as the appeals court explained in *Chapin*, in connection with a similar story "constructed around questions," the "mere raising of questions is, without more, insufficient to sustain a defamation suit in these circumstances," particularly where the article "advances alternative answers to the questions it raises, presenting both favorable and unfavorable views." 993 F.2d at 1098.  As the Court concluded, "inquiry itself, however embarrassing or unpleasant to its subject, is not accusation."  *Id.* at 1094.  Moreover, Ofori complains about the Article's expression of what might happen in the future *if* Ofori filed a civil lawsuit against Susan Russell. Compl. ¶ 14(l) (raising question of future possibility that, since "truth . . . is a defense," such an action "would invite further scrutiny of incidents Ofori might prefer not to revisit").  But this, too, is the quintessential type of statement that is not actionable under defamation law because it is at most raising questions about how future events might unfold.  *See, e.g.*, *Volm v. Legacy Health Sys., Inc.*, 237 F. Supp. 2d 1166, 1178 (D. Or. 2002) (statement in the form of a "rhetorical question" was not "an assertion of objective fact" and therefore not actionable).

Similarly, Ofori also appears to allege that the Article defames him by mentioning only some facts from Russell's cases against him, while omitting others that he might have found more favorable.  *See, e.g.*, Compl. ¶ 17 (alleging that defamatory implication is created because Article's sources were "selectively re-appropriated with the intent to mislead").  Not only does

---

[22] The Article's preceding sentence provides the context for this question:  Susan Russell "says she expected a cease and desist letter, or some threat of legal action, but has received none, although her website is the fourth item that appears on a recent Google search of [Ofori's] name."  Ex. 1 at 23.

the Complaint fail to identify any material omitted fact that would change the gist of the report,

but that is not the law.  For example, a report "of the true fact of a 14-year-old's rape allegation

was not capable of bearing the defamatory meaning that [the plaintiff] was actually guilty of the

alleged rape" even though:

> the report omitted the facts that (1) [he] had passed a lie detector
> test; (2) the alleged victim had been declared 'untestable' because
> of her emotional display during her polygraph examination; (3) a
> medical exam showed no signs of rape; and (4) numerous federal
> authorities had called the rape allegations unfounded.

*White*, 909 F.2d at 520 (discussing with approval *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 648-

49 (8th Cir. 1985), *reheard on other grounds*, 788 F.2d 1300 (8th Cir. 1986) (en banc)).  Thus, in

*Janklow*, the Eighth Circuit recognized that including these omitted facts might well have cast

doubt on the validity of the rape charge, but rejected the claim for libel by implication because

the published information was entirely true.  *See* 759 F.2d at 648 (purported omissions do "not

make what was published untrue").  Sitting *en banc*, the Court affirmed the panel's holding,

stressing that:  "Accounts of past events are always selective, and under the First Amendment the

decision of what to select" should "be left to writers and editors.  It is not the business of

government." 788 F.2d at 1306.  *See also Coles*, 881 F. Supp. at 33 (rejecting libel by omission

theory, and noting that "[c]ourts must be slow to intrude into the area of editorial judgment, not

only with respect to choice of words, but also with respect to . . . omissions from news stories")

(internal quotation marks and citations omitted); *Abadian v. Lee*, 117 F. Supp. 2d 481, 488 (D.

Md. 2000) (libel by omission claims disfavored because "'editorial decisions [to omit material]

are best left to editors'") (quoting *Newton v. NBC*, 930 F.2d 662, 686 (9th Cir. 1991)).

In any event, unlike the facts of *Janklow*, the Article at issue here did not omit material

facts, but instead accurately reported that Ofori was never criminally charged in connection with

Russell's allegations, that University disciplinary bodies found him not guilty of those charges,

and that Kathryn Russell's civil lawsuit was voluntarily dismissed.  As such, when the Article is

viewed in a whole, as it must, it is clear that defendant was not intending to endorse any

defamatory meaning Ofori asserts.[23]  Given that the Article is not capable of bearing the

defamatory meaning alleged by plaintiff, dismissal is required under the D.C. Anti-SLAPP Act

because he cannot establish a likelihood of success on the merits and under Rule 12(b)(6)

because he has failed to state a claim upon which relief can be granted.

**B.    The Statements Challenged by Ofori Constitute Privileged Reports of Judicial and Other Official Proceedings.**

In addition, most of the specific statements in the Article challenged by Ofori are

privileged reports of official proceedings and records, including those of the UVA Police

Department, the University of Virginia, the Commonwealth's Attorney's Office, and the Virginia

Circuit Court in which Ms. Russell's civil lawsuit was filed (and although he does not challenge

those portions of the Article, the United States Department of Education, the Virginia legislature

and the Virginia Crime Commission).

---

[23] Two of the Article's other individual statements challenged by Ofori are also not capable of bearing a defamatory meaning as a matter of law.  First, Ofori complains about the statement that "[a]s soon as the two women left the bar, Ofori, the suit states, called Mrs. Russell's suitemate, who was driving, to ask for a ride.  The suitemate agreed."  Compl. ¶ 14(d).  Putting aside questions of privilege, addressed in the next section, the statement that Ofori asked for a ride is not defamatory because it does not in any way "make the plaintiff appear odious, infamous, or ridiculous."  *Fleming v. AT&T Info. Servs., Inc.*, 878 F.2d 1472, 1475 (D.C. Cir. 1989) (internal quotation marks and citation omitted).  Second, plaintiff complains about the statement that "Ofori, who is a student at Wharton School of Business at the University of Pennsylvania, did not respond to the Hook's emailed request for comment or to emails sent to a consulting company he heads, Certify Me Now."  But this statement is both true, *see* Ex. 37, and not actionable as defamation in any event.  *See, e.g., Chapin v. Greve*, 787 F. Supp. 557, 566 (E.D. Va. 1992) ("refusing to answer reporters' questions is commonplace and certainly cannot reasonably be said to tarnish one's reputation.  People in the public eye do it all the time.  There is nothing odious or disgraceful about it."), *aff'd sub nom. Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1095 (4th Cir. 1993) ("'No comment' has become such a hackneyed response to media inquiries that it has been reduced to insignificance.").

Under District of Columbia law, this privilege immunizes the publication of fair and accurate reports of official actions, documents or proceedings.  *See, e.g.*, *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985); *Bell v. Associated Press*, 584 F. Supp. 128, 130 (D.D.C. 1984).  This privilege exists to enable journalists to accurately report on official proceedings without fear that they will be held liable for repeating allegations and statements relating to those proceedings, regardless of whether the allegations are true or false.  *Coles*, 881 F. Supp. at 31 n.3 ("The accuracy requirement relates to the accuracy of the reporting, not to the truth of the alleged defamatory statement itself.").  The privilege protects not only reports of governmental proceedings themselves, but also news reports recounting the allegations that "prompted" the governmental action or proceeding "in the first place."  *White*, 909 F.2d at 527-28 (privilege protects report of police union's letters that led to committee investigation of police captain's alleged drug use because "reports were fair summaries of the contents of the . . . letters" and "summarized the gist of the [letters'] allegations" such that defendant "met all of the requirements for invoking" the privilege).  Whether challenged statements are privileged is a question of law for the court, and is routinely decided at the motion to dismiss stage.  *E.g.*, *Hargrave v. Washington Post*, 2009 WL 1312513, at *1 (D.D.C. May 12, 2009) (granting defendant's motion to dismiss based on fair report privilege), *aff'd*, 365 F. App'x 224 (D.C. Cir. 2010); *Q Int'l Courier, Inc. v. Seagraves*, 1999 WL 1027034, at *4 (D.D.C. Feb. 26, 1999) (the "question of whether a published account is fair and accurate is a question of law") (citing *Coles*, 881 F. Supp. at 31).

Applying these standards, the fair report privilege undeniably bars Ofori's defamation claim.  A review of his Complaint makes abundantly clear that the bulk of the individual statements he enumerates are expressly quoting or paraphrasing Kathryn Russell's lawsuit

34

against Ofori and her Sexual Assault Board proceeding against him, and are therefore privileged as a matter of law.  First, as reflected in the chart below, each of the following statements about which Ofori complains simply repeats – virtually verbatim – allegations made in Kathryn Russell's civil lawsuit:

| Statements Challenged in Ofori's Complaint | Statements From Russell's Lawsuit |
|---|---|
| "As soon as the two women left the bar, Ofori, *the suit states*, called Ms. Russell's suitemate, who was driving, to ask for a ride.  The suitemate agreed."  Compl. ¶ 14(d) (emphasis added).[24] | "Shortly after getting in the car Ms. Russell received a cell phone call from Mr. Ofori requesting a ride to his residence on Virginia Avenue.  Both women discussed his request and agreed."  Ex. 17 ¶ 8. |
| "[Ms. Russell] took an air mattress from the trunk of her car, then went to her bedroom to retrieve the pump from under her bed.  That's when, *the suit alleges*, Ofori came into her room behind her and began touching her from behind."  Compl. ¶ 14(e) (emphasis added). | "[Ms. Russell] retrieved an air mattress from the trunk of her vehicle . . . .  After entering the apartment, Ms. Russell took the mattress to her room to use the air pump to blow up the air mattress.  Mr. Ofori followed her into her room.  While Ms. Russell was attempting to fill the mattress, Mr. Ofori grabbed her from behind several times."  Ex. 17 ¶¶ 12-14. |
| "[Ms. Russell] objected and tried to leave the room, but *she alleges* Ofori grabbed her, shut the door, turned off the light and pushed her onto the bed."  Compl. ¶ 14(f) (emphasis added). | "Ms. Russell attempted to leave and verbally protested Mr. Ofori's actions.  Mr. Ofori prevented her from leaving by holding her arms.  Ms. Russell again attempted to leave.  Mr. Ofori then positioned himself between Ms. Russell and the door.  He shut the door and turned out the light, staying between Ms. Russell and the door.  Mr. Ofori pushed Ms. Russell onto the bed."  Ex. 17 ¶¶ 15-17. |
| "*The suit says* [Ofori] held [Ms. Russell] down as he removed her clothes and his own, then proceeded to rape her as she pleaded for him to stop."  Compl. ¶ 14(g) (emphasis added). | "Ms. Russell did not remove her own clothes; instead Mr. Ofori forcibly removed them.  Mr. Ofori removed his own clothes without assistance from Ms. Russell.  Ms. Russell continued to verbally protest in any way she could, while unable to gain her freedom.  Mr. Ofori engaged in sexual intercourse with Ms. Russell, she repeatedly told him to stop what he was doing and that it was hurting her; he ignored her pleas."  Ex. 17 ¶¶ 18-19. |

---

[24] This statement is also not defamatory.  *See* note 23 *supra*.

| Statements Challenged in Ofori's Complaint | Statements From Russell's Lawsuit |
|---|---|
| "After raping [Ms. Russell] the first time, [Ofori] forced her to perform oral sex, *the suit alleges*, then raped her a second time." Compl. ¶ 14(h) (emphasis added). | "Mr. Ofori also forced Ms. Russell to perform oral sex that caused her to gag.  Mr. Ofori also forced Ms. Russell into sexual intercourse a second time." Ex. 17 ¶¶ 21-22. |
| "Ofori offered [Ms. Russell] a $10,000 settlement when she sued him.  [She] declined his money." Compl. ¶14(k). | "My client has authorized me to offer $10,000.00 in full and final resolution of the above referenced matter." Ex. 16 (settlement letter); *see also* Ex. 18 (docket showing Russell's lawsuit continued at that point). |

As indicated above, the Article clearly attributed each statement to records from Russell's lawsuit, and fairly and accurately reported their contents.  The Article's description of Ofori's defense in the UVA Sexual Assault Board is proceedings is similarly privileged:

| Statement Challenged in Ofori's Complaint | Ofori's Statement from UVA Proceeding |
|---|---|
| "Ofori's defense with the UVA sexual assault board was that Kathryn had 'tacitly agreed to have sex' by not saying no, and by requesting a condom." Compl. ¶ 14(j). | "My first point in questioning Ms. Russell's false claim of rape is that she was the provider of contraception.  By providing the contraception she tacitly agreed to have sex and was a willing participant knowing that contraception would be used to engage in sex." Ex. 7 at 2  (Ofori statement dated Mar. 25, 2004); *see also* Ex. 9 at 45:16-46:2 (hearing transcript quoting same); Ex. 8 at 3 (Ofori statement dated Apr. 23, 2004) ("Not all my actions would in a day-to-day situation be considered kosher" but "none of my actions broached or even swept near the arena of rape."). |

Ofori does not – and could not – dispute that Kathryn Russell asserted the allegations reported in the Article in her court pleadings, or that he made the statements attributed to him in connection with her civil lawsuit or the UVA Sexual Abuse Board proceeding.  As such, they are protected by the privilege for reports of judicial and other official proceedings.  *See Dameron*, 779 F.2d at 739 (privilege applicable where it is "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon

36

official documents or proceedings"); *McFarlane v. Esquire Magazine*, 22 Media L. Rep. (BNA)

2033 (D.D.C. June 8, 1994) (reports of pleadings filed in judicial proceeding protected by

privilege); *Ditton v. Legal Times*, 947 F. Supp. 227, 230 (E.D. Va. 1996) ("A publisher properly

attributes a report if the average reader is likely to understand that the report summarizes or

paraphrases from the judicial proceedings."), *aff'd*, 129 F.3d 116 (4th Cir. 1997).

To the extent that Ofori disputes the truth of the allegations made in these statements,

claiming they were based on a "false and misleading" charge by Kathryn Russell, Compl. ¶ 6,

that does not defeat defendant's privilege to report them. *See Hargrave*, 2009 WL 1312513, at

*1 (plaintiff's argument that defendant should have discovered that privileged testimony was

"false and misleading" "neither advances the libel claim nor defeats the privilege"); 1 Robert D.

Sack, Sack on Defamation § 7:3.5 (4th ed. 2010) (underlying "truth" is "irrelevant" to whether a

report is privileged). Similarly, Ofori's allegation that *The Hook* "is not shielded from liability

because the sources on which it relied were either selectively re-apportioned with the intent to

mislead the audience or unreliable" is unavailing. A publication need not be a verbatim account

or even a precisely accurate report of an official proceeding to be a fair and true report. *E.g.*,

*Ditton*, 947 F. Supp. at 230 ("Journalism is not legal scholarship . . . and a journalist cannot be

expected to footnote every sentence to her source of information.").

Finally, defendant has not "abused" the privilege or otherwise forfeited its protections. In

the District of Columbia, courts have variously characterized the privilege as "qualified" or

"conditional," or as "absolute." *See, e.g.*, *White*, 909 F.2d at 528 (whether official report

privilege is absolute is unsettled). Nevertheless, however characterized, the privilege is only

forfeited "when the publisher does not give a fair and accurate report of the proceeding."

Restatement (Second) of Torts § 611 cmt. a; *see Liberty Lobby, Inc. v. Dow Jones & Co.*, 838

F.2d 1287, 1302 (D.C. Cir. 1988) (the "column's reference to this action is absolutely privileged as an accurate report of a judicial proceeding.  The mental state of its author is irrelevant to this issue.").  As a result, the availability of the privilege is necessarily unaffected by the allegations of "actual malice" in the Complaint, which contends that the defendant published notwithstanding that defendant purportedly "knew these statements were false or acted with reckless disregard as to whether these statements were false." *See, e.g.*, Compl. ¶ 16.  Indeed, the privilege exists for the precise purpose of permitting "a person to publish a report of an official action or proceeding . . . even though the report contains what he knows to be a false and defamatory statement."  Restatement (Second) of Torts § 611 cmt. b.

Given that each of the foregoing allegations is a privileged report of judicial and other proceedings, dismissal is required under the D.C. Anti-SLAPP Act because Ofori cannot establish a likelihood of success on the merits and under Rule 12(b)(6) because he has failed to state a claim upon which relief can be granted.

### C.   Ofori Cannot State a Claim for False Light or Intentional Infliction of Emotional Distress.

The law clearly prohibits Ofori from seeking to perform an end-run around a deficient claim for libel by recasting it as a claim for false light or intentional infliction of emotional distress.  *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55-56 (1988) (claim for intentional infliction of emotional distress arising out of expression is subject to limitations applicable to defamation claim); *White*, 909 F.2d at 518 (noting that the same privileges applicable in a defamation action apply to false light claim); *Shipkovitz v. Washington Post Co.*, 571 F. Supp. 2d 178, 186 (D.D.C. 2008), *aff'd*, 408 F. App'x 376 (D.C. Cir. 2010) (when plaintiff brings both defamation and false light claims based on same conduct, courts analyze both claims in the same manner) (citing with approval *Blodgett v. Univ. Club*, 930 A.2d 210, 223 (D.C. 2007));

*Washington v. Smith*, 893 F. Supp. 60, 64-65 (D.D.C. 1995), *aff'd*, 80 F.3d 555 (D.C. Cir. 1996) (intentional infliction of emotional distress claim denied where defamation claim based on same facts fails); *Clyburn v. News World Commc'ns, Inc.*, 705 F. Supp. 635, 643 (D.D.C. 1989), *aff'd*, 903 F.2d 29 (D.C. Cir. 1990) (plaintiff cannot pursue emotional distress claim when defamation claim fails); *Clawson v. St. Louis Post-Dispatch, L.L.C.*, 906 A.2d 308, 317 (D.C. 2006) (where statement underlying defamation claim was found not defamatory, claim for intentional infliction arising from same statement was properly dismissed).

Even apart from these well-settled limitations on "tag along" claims in defamation actions, Ofori could not establish a false light claim because the Article accurately reports the findings in his favor in each of the various proceedings against him, and therefore does not portray him in a false light. *See Shipkovitz*, 571 F. Supp. 2d at 183 (dismissal of libel and false light claims appropriate where reports were accurate). He likewise cannot establish a claim for intentional infliction because he has not alleged conduct that goes "beyond all possible bounds of decency" and that is "regarded as atrocious, and utterly intolerable in a civilized community." *Browning v. Clinton*, 292 F.3d 235, 248 (D.C. Cir. 2002) (internal quotation marks and citations omitted); *see also Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980) (same). Nor has he offered anything other than boilerplate allegations of emotional distress. *See* Compl. ¶ 34; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (pleading a cause of action "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation") (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Given that Ofori cannot establish claims for either false light or intentional infliction as a matter of law, their dismissal is required under the D.C. Anti-SLAPP Act because he cannot establish a likelihood of success on the merits and under Rule 12(b)(6) because he has failed to state a claim upon which relief can be granted.

## CONCLUSION

For all of the reasons set forth above, Defendant Better Publications, LLC respectfully requests that the Court dismiss plaintiff's Complaint with prejudice.


Dated: May 2, 2013                    Respectfully submitted,

                                      LEVINE SULLIVAN KOCH & SCHULZ, LLP


                                      By:    /s/ Seth D. Berlin
                                           Seth D. Berlin (Bar No. 433611)
                                           Shaina D. Jones (Bar No. 1002801)

                                      1899 L Street, NW
                                      Suite 200
                                      Washington, DC  20036-5514
                                      Telephone:  (202) 508-1100
                                      Facsimile:  (202) 861-9888
                                      sberlin@lskslaw.com
                                      sjones@lskslaw.com

                                      *Counsel for Defendant Better Publications, LLC*